W. SHARP, Judge,
dissenting with opinion.
While it is clearly in the best interest of the four-year-old child involved in this case to be adopted by its foster family with whom he had been living his entire life since birth, I disagree that the natural rights of the father, Tyrone Rivers, should be terminated. Reliance on Williams v. Department of Health and Rehabilitative Services, 648 So.2d 841 *1295 (Fla. 5th DCA 1995) is misplaced, as providing precedent for River’s “prospective abuse and neglect.” River’s primary fault in this case was his unwillingness to separate from and give up his wife, who he loved, as the price of gaining custody of his son. But at the termination hearing, he agreed to do so, and I think he should have been given a chance to have custody of his son, and care for him, alone.
In Williams, both parents were involved in the use of drugs and domestic violence. Their children were declared dependent and removed to foster care for those reasons. Four years later, the father’s parental rights were terminated. This court said:
What makes this case difficult is that, in several respects, Gary Williams did endeavor to meet his obligations under the performance agreement. He had stable employment as a mason, earning a good income. He attended parenting classes, frequently visited the children and cooperated with HRS counselors. He attended outpatient drug treatment.... What he did not do was remain drug free, a key component of the performance agreement. ... Williams also seemed incapable of terminating, or at least substantially improving, his violent, co-dependent relationship with the children’s mother, who was so severely addicted to drugs that she never attempted to comply with her performance agreement and did not contest the termination of her parental rights.
In this case, there was no evidence that Rivers at any time took drugs or was addicted to them. There was no domestic violence. He complied fully with his performance agreement in all substantial regards, including the requirement that he submit to random urinalysis, when requested by HRS, between two specified dates. The results were negative. The psychological examination called for by the performance agreement also concluded he was not a drug user. He did not submit to a urinalysis request shortly before the termination hearing, but that was long after the dates set forth in the performance agreement. Rivers explained that when he received that last request he did not have sufficient cash to pay for the test.
Rivers did frequently visit with his son and his wife’s two other children by a prior relationship, who considered him their “Daddy.” He has had a long-time job with the City of Orlando and works from 7:00 a.m. to 3:30 p.m. as an equipment operator. HRS at first allowed him visits with the children on the weekends, and he visited regularly twice a month. But after HRS changed visitation to weekdays, he had trouble getting time off, and arranging a day convenient for the counselor, the foster mother, and himself. In order to visit during the week, he had to leave work two hours early, and use up vacation time. Only once did he not come for a visit he arranged and that was because he simply could find no one to drive him there for the visit. Rivers has no ear, and walks to work.
No one denied that the son in this case (as well as the other children) love and have bonded with Rivers. They run to greet him when he appears, and hug him. The psychological evaluation of Rivers said that there was no reason to conclude that he could not be a responsible, caring parent. The only reason it recommended denying him custody of his child, was because he could not get his wife to successfully complete a drug rehabilitation program and, in his household, she could potentially pose a risk to the child.
Rivers testified that he had tried to get his wife into various drug rehabilitation programs. Many of them were expensive and beyond his means to provide. The day treatment programs were not successful, perhaps due to the fact that the wife was so severely addicted that she really required a residential program. Most of those programs were far beyond River’s financial ability to provide, and either were not acceptable to his insurance provider, Pru Care, or the program did not accept Pru-Care. At the termination hearing, the wife testified she had applied to and expected to enter a residential program in Avon Park in the near future.
The testimony of Rivers was quite tragic, if one reads it with one’s heart. He said he had done everything HRS asked of him except leave his wife. He understood HRS wanted him to choose between his son and his wife. He loved his wife and wanted to *1296 provide for her. He could not afford two households. He had been trying to keep his whole family together. He argued with her frequently to get her into day treatment, and she did try. She had formerly been working at two jobs, but with her attempts to get treatment in day treatment situations, she could not hold down a job. He was content to support her as a housewife, despite HRS’s requirement that she get treatment and in addition, hold down a full-time job.
During the hearing, the wife orally agreed to give up her parental rights on the ground that she could not overcome her addiction without residential treatment, and they would be better off without her. The court recognized that this was a very difficult and generous act on her part. Later in the same hearing, the wife also agreed to separate from Rivers, and seek a divorce so that she would no longer prevent him from having custody of his child. The court apparently chose to ignore that offer.
Rivers testified he was capable of, and willing to care for the child alone, and that he would not allow the mother access to the child, as long as she had not successfully been rehabilitated from her drug addition. He had never allowed her access during any of his visitations with the children, as required by HRS. No one denied that was the ease. However, the court was unwilling to give him this last chance. I think it should have.